**Hass Estate**

*Samuel R. Wurtman* and *Harry Siegel*, for accountants.

*Arthur D. Rabelow*, for claimants.

SHOYER, J., April 28, 1965.—John Hass died February 10, 1962, intestate, not survived by a spouse, leaving, as appears from the statement of proposed distribution, as the persons entitled to his estate under the intestate laws, eight children, three daughters, Martha Cobourn, Eleanor Oczkowski and Edna Babacz, and five sons, Emil, Frank, John, Jr., Erhart and George, all of whom are sui juris except Emil, who survived his father but died October 29, 1964. . . .

The only question requiring adjudication arises because of an attachment execution which was issued out of the County Court of Philadelphia, as of December term, 1964, no. 4984D, attaching the distributive share of George Hass on a judgment obtained on behalf of Anna Hass in the amount of $9,098. The judgment results from an order which was entered in 1945, in the County Court, on behalf of Anna Hass against her husband, George Hass, for the support of herself and their daughter Georgianna, the arrearages on which have accumulated to the amount of the judgment entered.

George's distributive share is also claimed by his sister (one of the accountants), Martha Cobourn, by virtue of a written assignment dated January 26, 1963, given her by her brother. The assignment recites that George acknowledges "that I am indebted to MARTHA COBOURN (hereinafter called the Assignee) in the sum of $3,000.00, and for good and valuable consideration, and intending to be legally bound, hereby do sell, assign, transfer and convey to the said Assignee all of the right, title and interest, up to and not to exceed the sum of $3,000.00, that I hereafter may have in and to the Estate of my deceased father,

John Hass". The assignment was admitted into evidence (N.T. pp. 14, 15, 80). Its validity was placed at issue . . .

The testimony establishes, and I find as facts:

1. That a warrant for the arrest of George Hass has been outstanding since 1950 for contempt for failure to comply with the order of support of his wife and daughter as directed by the County Court of Philadelphia;

2. That a writ of attachment execution issued out of the County Court of Philadelphia, as of December term, 1964, no. 4984D, on a judgment in the amount of $9,098 (arrearages on support order) in favor of Anna Hass against George Hass, which was served on the accountants herein, as garnishees, attaching the interest of the defendant in the estate of John Hass, deceased;

3. That on or about January 26, 1963, George Hass signed and sealed a paper purporting to assign his interest in his father's estate to his sister, Martha Cobourn.

In ascertaining the validity of the disputed assignment, we turn our attention first to the question of George's solvency in January 1963. Martha's testimony establishes that George was hard pressed to pay his current obligations and was then in Philadelphia for the express purpose of borrowing from his sister (N.T. p. 15). He had suffered a heart attack and was unable to return to work for several months. He needed money for his Blue Cross (N.T. p. 18), he was in arrears with his payments on his trailer, his gas and electric and owed money to his doctor (N.T. p. 19). While there is no exact value given for George's net assets, there seems no doubt that with his accumulated support claims, he was insolvent. In any event, the burden of proving solvency is clearly upon the assignee: Farmers Trust Company of Lancaster v. Bevis,

331 Pa. 89. And where kinship is involved, relationship is a circumstance weighing in determination of whether the assignor's intention was to pay or secure a debt, or merely to use the debt as cover for a fraudulent conveyance: Berger v. Kraisman, 376 Pa. 127, 130.

A substantial doubt arises as to whether Martha Cobourn actually paid "fair consideration" for her brother's assignment to her. The auditing judge is not persuaded that her testimony is entitled to credibility. The record shows that Martha made the $725 and $900 checks out to her brother at a time when she had insufficient funds in her account, yet she wants the court to believe that she gave George the cash when she endorsed and cashed those checks weeks later. Her testimony as to where she got the cash is vague and uncertain. Was it from her husband, their mutual savings, a safe deposit box or the Third Federal Savings and Loan Association? She indicated each of them in turn. The records from the savings and loan association show that the checks were not charged against any of her accounts. Mr. Park, the Third Federal's assistant treasurer, testified (N.T. p. 110) that on February 15 and 21, 1963, the checks were respectively accepted by the association, and after being marked with Martha's account number for identification, they were cashed by the association. The ledger sheets of the Broad Street Trust show that it was not until February 4th (Jan "8" is an obvious typographical error) that Martha built up her account sufficiently to cover the $725 check together with other checks which were probably outstanding. Her brother George was living at her home during January and February. On January 26th, the date of the assignment, her account was insufficient to cover these checks. Was George actually holding them, or did she predate them when drawing them at a later date? These two

large checks, in contrast with her other checks, are not numbered. Why not? She did not explain. Nor did she offer any sound explanation for all these ramifications in getting the cash to George, if in fact she did give him any cash. This, too, is doubtful, because Mr. Rabelow has noted that the bank's ledger sheets show a usual or normal deposit of $45, or a multiple thereof, $945, $225 and $90. He has also noted the deposit of $770 on February 20th, and $945 on February 28th, these two deposits being the equivalent of $45 added to the face amount of each of the two questioned checks. This leads to the inference that Martha did not actually give the cash she received from the Third Federal to George, but simply set up a series of recorded transactions to give support to her testimony.

It is significant that Martha's husband did not appear to corroborate her version of the assignment, and also her denial of Anna's visit to their home at the time of the funeral of Martha's mother. Martha testified that her husband knew all about the assignment, and Anna said he was present when she had the discussion concerning George's arrearages at their home. Martha explained his absence on the ground that he was working, and thereby contradicted her other testimony that he worked at night. The auditing judge is warranted in inferring that his testimony would not have aided Martha, and that he was unsympathetic to her scheme to aid a brother whom she herself had characterized as "bad pay", according to Anna.

The irritation and reluctance which Martha, while testifying, exhibited to a full and frank disclosure of these financial transactions burst into open hostility at times. Having paid inheritance tax on February 13th of $460, two percent of $23,000, at the very time she was carrying on these manipulations with George, her denial on cross-examination that she then knew the approximate value of the net estate is patently un-

true. Undoubtedly, the figure of $3,000 was placed in the assignment only after an accurate calculation of George's distributive share had first been made. I find Martha to be a false and thoroughly unreliable witness.

Anna Hass, by contrast, made a good impression as a witness, and I find no reason to discredit her testimony even though she has a prime interest in the outcome.

Section 4 of the Uniform Fraudulent Conveyance Act of May 21, 1921, P. L. 1045, 39 PS §354, provides:

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration."

In Commonwealth of Pennsylvania, Department of Public Assistance, v. Smith, 344 Pa. 381 (1942), the court stated:

"Gerald J. Smith testified, in somewhat vague fashion, that the conveyance had been made to reimburse him for moneys he had laid out for his mother's support over a long period of years. Even if true, and even though an agreement to that effect has been made in advance by mother and son, it would not defeat the rights of plaintiff, because where a conveyance of property is made in consideration of an agreement to support the grantor in the future, it is invalid as to creditors if by the conveyance the grantor renders himself unable to pay his debts, the theory being that a conveyance whereby a debtor puts his property beyond the reach of his creditors under an agreement that it shall be devoted in any way to his own use is constructively fraudulent" . . .

I, therefore, also find the following facts:

4. At the time the assignment is alleged to have been executed, George Hass was insolvent.

5. George Hass did not receive fair consideration for the purported assignment by him to his sister, Martha Cobourn.

6. The purported assignment by George Hass was a mere device to defeat the rights of his creditors, especially his wife.

In view of the foregoing, I find that the attachment execution has precedence over the assignment by George. The accountants are directed to guide themselves accordingly. . . .

And now, April 28, 1965, the account is confirmed nisi.